UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MBFMCA, LLC, MIDWEST
BUSINESS FUNDING, INC. and
SCOTT CALLAHAN,

    Plaintiffs,

    v.    CASE NO: 1:23-cv-02162

PAUL C. MILLER and
BRIAN M. LEVINE,    **COMPLAINT**
    **JURY TRIAL DEMANDED**

    Defendants,

JAMES MILLER,

    Relief Defendant.

## COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND

Plaintiffs MBFMCA, LLC ("MBFMCA"), Midwest Business Funding, Inc. ("MBF") and Scott Callahan ("Callahan" and, with MBFMCA and MBF, collectively "Plaintiff"), by and through their undersigned counsel, for their Complaint against Defendants Paul C. Miller ("Miller") and Brian M. Levine ("Levine"), and against James Miller ("James Miller") as Relief Defendant, allege as follows:

### NATURE OF THE ACTION

1. This is an action against Defendants for breach of contract, unjust enrichment, fraud, breach of fiduciary duties and declaratory relief arising out of Defendants' administration and operation of certain entities created to participate in the Merchant Cash Advance ("MCA") business.

2. In sum, Defendants breached their obligations set forth in the relevant Operating Agreements both regarding the administration of their business affairs and regarding the benefits

1

due and owing to each Member, and, in particular, to MBFMCA and Callahan, relating to the Parties' jointly-created business.

3. To accomplish their objective of depriving Plaintiffs of money and corporate ownership and opportunity due to them, Defendants diverted and disguised monies, including profits and revenue, due to Plaintiffs, including by distributing funds to Defendants and to the exclusion of Plaintiffs.

4. On multiple occasions since at least December 2020, Defendants have transferred funds, including funds belonging to Plaintiffs, to James Miller for no legitimate purpose and contrary to Defendants' promises, representations and obligations.

5. Defendants also failed to give notice of distributions, third-party payments and other material business activities in violation of their obligations set forth in the Operating Agreements and required by common law.

**PARTIES**

6. MBFMCA is an Indiana corporation licensed and doing business in Indiana with its principal office located at 10412 Allisonville Road, Suite 201, Fishers, Hamilton County, Indiana 46038. Scott Callahan and JoAnn Callahan are each 50% Shareholders of MBFMCA.

7. MBF is an Indiana corporation licensed and doing business in Indiana with its principal office located at 10412 Allisonville Road, Suite 201, Fishers, Hamilton County, Indiana 46038. Callahan is the owner of MBF.

8. Callahan is an individual, citizen and resident of the State of Indiana.

9. Paul C. Miller is an individual, citizen and resident of the State of Missouri.

10. Brian M. Levine is an individual, citizen and resident of the State of New York.

11. James Miller, the brother of Miller, is an individual, citizen and resident of the State

of Massachusetts.

## INVOLVED NON-PARTY ENTITIES

12. Axent-Midwest Capital, LLC ("Axent-Midwest") is a limited liability corporation, organized and existing under the laws of the State of Nevada, with its principal place of business at 4520 Main Street, Suite 1570, Kansas City, Missouri 64111. Axent-Midwest was incorporated on or about October 18, 2019 under the name Axent-Midwest Capital Fund, LLC. The name of the entity was changed to Axent-Midwest Capital, LLC on or about April 9, 2020. Miller is the managing member of Axent-Midwest. The members of Axent-Midwest are Axentia, MBFMCA and 72nd Street Partners.

13. Axentia MCA Solutions, LLC ("Axentia") is a Nevada corporation with its principal office located at 4520 Main Street, Suite 1570, Kansas City, Missouri 64111. Miller is the managing member of Axentia. Axentia is a member of Axent-Midwest.

14. 72nd Street Partners is a New York corporation with its principal office located at 210 East 35th Street, Suite 3A, New York, New York 10016. Levine is the owner of 72nd Street Partners. 72nd Street Partners is a member of Axent-Midwest.

15. TC&J is a Nevada corporation with its principal office located at 4520 Main St., Ste.1570, Kansas City, MO 64111. It was formed on October 30, 2019, for the purported purpose of providing administrative and operational services to Axent-Midwest when, in fact, it provided no services, had no operations and had no employees. Its initial members were Axentia, MBFMCA and 72nd Street Partners. On January 1, 2020, Miller and Levine, acting through Axentia and 72nd Street Partners, stripped MBFMCA of its membership interest.

## JURISDICTION AND VENUE

16. This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. Section 1332(a)(2). Plaintiff is a citizen of the State of Indiana and Defendants are citizens of States other

than Indiana.

17. The amount in controversy exceeds $75,000.00.

18. Venue is proper in this Court under 28 U.S.C. Sections 1391 (b) (2) because a substantial part of the events giving rise to this action occurred in this District.

## PROCEDURAL BACKGROUND

19. Miller and Levine previously were Defendants in an arbitration pending before the American Arbitration Association entitled *MBFMCA, LLC and Midwest Business Inc. against Axent-Midwest Capital, LLC, Axentia MCA Solutions, LLC, 72nd Street Partners, LLC, TC&J Asset Management, LLC, Paul C. Miller, and Brian M. Levine*, AAA Case No.: 01-22-0000-0675.

20. On August 26, 2022, Miller and Levine moved to dismiss the Arbitration against them personally, contending that as individuals they did not execute the arbitration agreements that mandated that all disputes relating to Axent-Midwest and TC&J be arbitrated by AAA, and thus that AAA did not have jurisdiction over them.

21. On October 18, 2022, AAA Arbitrator Nicholas A. Gowen granted the motion and dismissed the Arbitration against Miller and Levine, finding AAA did not have jurisdiction over Miller and Levine individually and that claims against them were required to be brought in judicial proceedings.

## FACTUAL ALLEGATIONS

22. In approximately 2015, Miller founded AxentAdvance Capital, LLC ("AxentAdvance"). AxentAdvance engaged in a segment of the factoring industry known as the Merchant Cash Advance ("MCA") business, in which a lender purchases future accounts receivable from merchants. Miller was its manager, CEO and sole control person at all relevant times.

23. On May 27, 2015, AxentAdvance entered into a Master Participation Agreement

4

("MPA") with a company known as Capital Stack, LLC. ("Capital Stack"), a company currently known as or doing business as, or wholly owned by, eProdigy. Capital Stack is a lender in the MCA business for which eProdigy acts as a server. David Rubin is the founder of both Capital Stack and eProdigy. Most if not all of AxentAdvance and then Axent-Midwest's MCA business is coordinated with Capital Stack and eProdigy and is done pursuant to the MPA.

24. eProdigy's business model involves the "syndication" of MCA loans. Specifically, originating lenders like AxentAdvance or, later, Axent-Midwest, place funds with eProdigy or bring borrowers in need of cash advances to eProdigy. eProdigy, in turn, locates or approves merchants in need of funding, extends MCA funding to those merchants, and manages the loan portfolio. Some MCA loans are made with funds belonging to just one lender, while others involve funds belonging to more than one lender. eProdigy also places its own funds into the syndicated loans at times.

25. After eProdigy takes its fees, which normally are based on 4% of the "Right to Receive" ("RTR"), *i.e.*, the remaining profit as a result of extending funds to the borrowers is distributed to the participants in each syndication.

26. AxentAdvance was in a precarious financial condition by 2019. Upon information and belief, AxentAdvance was accumulating debt that far exceeded its profits.

27. In an effort to limit his own financial losses, Miller conceived of a plan to recoup the debt using other people's money. The plan consisted of transferring AxentAdvance's debts and assets, consisting of portfolios of MCA loans that he planned falsely to value as if the portfolios were fully performing, notwithstanding that a substantial percentage of the portfolios were in default or were otherwise uncollectable, and thus rendering the paper value of the portfolios grossly exaggerated and inaccurate.

28. To carry out this plan, Miller, using an introduction made by Levine, approached

Callahan, the owner of a successful boutique commercial finance company, MBF. Miller told Callahan that he had expertise in the MCA business and access to the eProdigy platform, which he described as the best platform in the business. Miller also shared business projections with Callahan which, among other things, showed and represented that the debts AxentAdvance owed would quickly be paid off and fully satisfied.

29. Miller proposed that they form a new company together for the purpose of making MCA investments. The plan, as Miller described it, was to use Miller's relationship with eProdigy and knowledge of the MCA business, and to use Callahan's business relationships in the lending industry, to create a new and successful MCA business.

30. After further discussion, and based on Miller's assurances and following limited due diligence, Callahan agreed.

31. Notably, when soliciting Callahan's participation in the proposed new venture, Miller never informed Callahan of the precarious state of his company's existing financial position, which was not reflected on the information provided during the truncated due diligence period. Instead, Miller consistently assured Callahan that he was an expert in the MCA business and that his portfolio was highly profitable.

32. On or about October 2, 2019, Axent-Midwest Capital Fund, LLC ("Axent-Midwest") was formed under the laws of the State of Nevada. Its initial members were Axentia MCA Solutions, LLC (an entity controlled by Miller), which held a 45% membership interest; MBFMCA, LLC (an entity controlled by Callahan), which held a 45% membership interest; and 72nd Street Partners, LLC (an entity controlled by Levine), which held a 10% membership interest.

33. Originally, Miller and Callahan were designated as co-managers of the new entity, though Miller never intended that Callahan would be permitted to play an active role in managing the business.

34. Further to his plan to siphon investor funds to himself, Miller on October 30, 2019, fashioned an Operating Agreement to create TC&J Management, LLC, purportedly to provide management and administrative services for Axent-Midwest. TC&J was to receive 2.5% of the value of the portfolio. The initial members of TC&J were Axentia MCA Solutions, LLC, MBFMCA and 72nd Street Partners, LLC.

35. In fact, TC&J did absolutely no work and had no representatives or employees, no function and no responsibilities.

36. Axent-Midwest's business plan, as designed by Miller and communicated to Callahan, was to raise funds from outside investors by issuing promissory notes pursuant to a private placement memorandum ("PPM") and for Callahan to use his extensive business connections and expertise to solicit additional funds.

37. Miller further represented that the funds raised from those investors would then be used to provide MCA funding, both by acquiring established MCA portfolios and by issuing new MCA loans, directly and through syndication on the eProdigy platform.

38. In fact, Miller's intention, and ultimately what he did, was to use the funds to pay debts that Axentia purportedly owed to his brother James Miller and to himself and to divert the remaining revenue to himself and to Levine, and to the exclusion of Plaintiffs.

39. On December 31, 2019, Axent-Midwest Capital Fund, LLC ("Axent-Midwest") acquired AxentAdvance's MCA portfolio for a total purchase price of $4,700,000. The purchase price consisted of (1) the assumption of a debt in the form of a promissory note in favor of AxentAdvance (*i.e.*, Miller), in the amount of $1,500,000; (2) the assumption of a debt in the form of a promissory note purportedly owed by AxentAdvance to James Miller, in the amount of $3,000,000; and (3) the assumption of a debt in the form of a promissory note purportedly owed by AxentAdvance to an individual named Elisse Porter, in the amount of $200,000.

40. Miller did not disclose the actual value of the AxentAdvance MCA portfolio to Callahan or to any of the Noteholders when causing Axent-Midwest to purchase that portfolio at its full book value.

41. Miller and Callahan were designated as co-managers of the new entity, though Miller never intended that Callahan be permitted to play an active role in managing the business.

42. Axent-Midwest's business plan, as designed by Miller and communicated to Callahan, was to raise funds from outside investors by issuing promissory notes pursuant to a private placement memorandum. The funds raised from those investors would then purportedly be used to fund investment portfolios.

43. Miller's actual plan was to raise funds for Axent-Midwest to satisfy the debt that was purportedly due to his brother and to him, by enticing Callahan to find investors from his vast business connections and to solicit investors using a PPM.

44. To recruit investors, Axent-Midwest began circulating the PPM in or about November 2019, together with a PowerPoint presentation describing the offering.

45. On March 26, 2020, MBFMCA made a $500,000 investment in Axent-Midwest.

46. Defendants made no similar investment (or, in fact, any investment) in Axent-Midwest.

47. In addition, Callahan continued to work diligently to attract investors to Axent-Midwest. Miller, in contrast, failed to attract any investors to Axent-Midwest other than a single investor located in Texas who made a $500,000 investment.

**WRONGFUL TAKING**

48. Without reason or basis, and without consideration of any sort, almost immediately after MBFMCA's investment in Axent-Midwest, Defendants threatened to wrestle control of Axent-Midwest from Callahan and MBFMCA. In this manner, Defendants would be able to

control the books and records of the company, and have unfettered and unscrutinized access to the books and records, so that Defendants could hide the diversion of funds to Defendants and from Plaintiffs, so that Defendants could hide that Axent-Midwest's portfolio transferred from Axentia had a value far less than Miller had represented, so that Defendants could hide that Miller was not attracting any new investors, and so that Defendants could hide that the investors whose funds Callahan was locating for Axent-Midwest were being used to pay off Miller and James Miller's purported pre-existing debts and not to invest in new portfolios and for any other use that could generate profits for, or otherwise be for the benefit of, Axent-Midwest.

49. As they had always intended, Defendants, by an Amended Operating Agreement dated April 9, 2020 (formalizing a decision previously made on January 1, 2020, by Consent in Lieu of Special Meeting of Members), reduced MBFMCA's ownership interest in Axent-Midwest from 45% to 15%, increased Miller's company Axentia MCA's ownership interest from 45% to 65%, and increased Levine's company 72nd Street Partners' ownership position to 20%. Defendants also inserted Miller as the Sole Managing Member, a position he *de facto* always held.

50. In order to assure Defendants' complete control of Axent-Midwest, Defendants also usurped for Miller the role of sole signatory for the Company.

51. MBFMCA received no consideration for the ownership interest that was stripped from Callahan.

52. Also without any consideration to MBFMCA, on or about the same time, Defendants, acting through the other members of TC&J stripped MBFMCA of its Membership interest in TC&J. As with Axent-Midwest, MBFMCA received no consideration for Defendants' wrongful taking of Callahan's membership interest in TC&J.

53. Callahan was unable to fight Miller's actions or resign from Axent-Midwest. He was responsible for multiple Noteholders who had invested in Axent-Midwest by that time and knew

that, if he left Axent-Midwest, no one would be left to protect the Noteholders and their financial positions in the company.

54. Callahan protested Miller's actions. The only concession he received was a promise by Miller that, if Callahan attracted additional funds into the company, Miller would increase MBFMCA's financial position from 15% to 25%, something that Miller never effectuated.

55. Plaintiffs also demanded financial, accounting and trading information relating to Defendants, as was their right. Defendants failed and refused to provide the financial, accounting, trading and related information.

## INDY ACQUISITION SYNDICATION

56. At or about the same time period, Callahan introduced a business colleague in the real estate business to Miller to discuss cash advance arrangements for the colleague's business, Indy Acquisition ("Indy Acquisition"). The potential business promised to be financially beneficial to Axent-Midwest but Miller, unbeknownst to Callahan, had so depleted Axent-Midwest's finances that Axent-Midwest was not able to participate in the requested funding without assistance.

57. Miller told Callahan that Axent-Midwest would enter into a business relationship with Callahan's business colleague, and thus make available the MPA and eProdigy's platform, but that Callahan had to participate financially independently of Axent-Midwest in the funding that would be made available.

58. According to the Agreement between Axent-Midwest and MBF, the entity that Callahan designated to participate in the syndication involving Callahan's business colleague ("Indy Acquisition Syndication"), eProdigy would be paid 4% of the RTR and Axent would be paid 2.5% of the RTR. MBF would then receive the remainder.

59. The Indy Acquisition Syndication funded three deals. MBF participated by making

contributions as follows: $500,000; $150,000; and $100,000. Because of the rollover in funds, the face amount of the syndications was $500,000 for the first deal; $650,000 for the second; and $750,000 for the third deal.

60. For each of the three deals, Indy Acquisition fully repaid its obligations. In turn, eProdigy received its 4% RTR; as agreed upon, eProdigy, after taking its share of the Syndication, then transferred the remaining RTR to Axent-Midwest and Axent-Midwest, in turn, obtained its agreed-upon 2.5% of the RTR (unilaterally changed by Defendants for the Third Syndication to 4.01%). Axent-Midwest then was obligated to transfer the remainder to MBF. With regard to the first deal and the second deal, Axent-Midwest fulfilled its obligations to MBF.

61. With regard to the third deal, Axent-Midwest transferred the RTR as required to MBF until August 2020. From August to March 2021, Axent-Midwest retained and refused to transfer the funds due and owing to MBF, depriving MBF of at least the approximate amount of $255,175.50 (even accepting the unilateral change to 4.01% for Axent-Midwest's RTR for the Third Syndication). In addition, MBF never received its percentage interest in Axent-Midwest's payment of the RTR as it was entitled.

**DIVERSION OF FUNDS**

62. There are at least 30 transactions amounting to $626,247.10 from Axent-Midwest to Miller between December 2019 and October 2021. These consist of 28 transactions between December 17, 2019 and October 1, 2021, from Axent-Midwest's bank account to Axentia in the net amount of $527,668.76, and another two transactions dated December 17, 2019, and January 7, 2020, totaling $98,578.34 and transferred from Axent-Midwest's bank account to another one of Miller's wholly owned companies, Axentia Card Solutions, even though that company was not a Member of Axent-Midwest.

63. None of these 30 transactions were disclosed to Callahan and neither received any

such transfers.

64. On July 1, 2021, Axent-Midwest transferred to Levine via 72nd Street $50,000.

65. No disclosure of that transaction was made to Callahan or MBFMCA and neither received any such transfer.

66. From February 10, 2020 through October 15, 2021, $615,157.64 was transferred from Axent-Midwest to TC&J. In turn, TC&J made at least 21 transfers to Axentia and Miller totaling $311,826.27. TC&J made at least 22 transfers to 72nd Street and Levine from June 1, 2020, through October 18, 2021, totaling $188,702.57.

67. None of the transfers were disclosed to MBFMCA or Callahan and neither received any such transfers.

68. The Operating Agreement required that MBFMCA receive such distributions at the same time as Axentia and 72nd Street.

69. At no time was money distributed to MBFMCA or Callahan from Axent-Midwest.

## COUNT I: BREACH OF CONTRACT AXENT-MIDWEST CAPITAL FUND, LLC

70. Plaintiffs repeat and reallege the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

71. Plaintiffs, in exchange for valuable consideration, entered into the Axent-Midwest Capital Fund, LLC Operating Agreement in October 2019, as well as the other Agreements identified above.

72. Plaintiffs performed all of their obligations under the Axent-Midwest Capital Fund, LLC Operating Agreement as well as under the other Agreements identified above.

73. Defendants breached their duties and obligations relating to the administration of Axent-Midwest as alleged above, including their duties and obligations under the Operating

Agreement.

74. In entering into the Axent-Midwest Capital Fund, LLC Operating Agreement, Plaintiffs relied upon Defendants to deal fairly and to take no action that would prevent or hinder Plaintiffs from obtaining the benefit of their bargain with Defendants.

75. In addition to the terms of the Axent-Midwest Capital Fund, LLC Operating Agreement, Defendants impliedly covenanted that each would deal with Plaintiffs fairly and in good faith and would not arbitrarily, capriciously, or without good cause deprive Plaintiffs of the benefit of their bargain or wrongfully deprive Plaintiffs of the right to full and fair consideration.

76. By the acts alleged above, Defendants breached the implied covenants of good faith and fair dealing, and each of its other covenants set forth above.

77. As a result of the foregoing conduct, Defendants have suffered damages in an amount to be proven at trial, in excess of $4 million.

78. Defendants' conduct, as alleged above, was willful, malicious, and intentional, and done for the purpose of depriving Plaintiffs of property or legal rights or otherwise causing injury, and, therefore, was despicable conduct that subjected Plaintiffs to a cruel and unjust hardship in conscious disregard of Plaintiffs' rights, so as to justify an award of exemplary and punitive damages in an amount to be established at trial.

## COUNT II: BREACH OF CONTRACT – TC&J ASSET MANAGEMENT, LLC

79. Plaintiffs repeat and reallege the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

80. Plaintiffs, in exchange for valuable consideration, entered into the TC&J Asset Management, LLC Operating Agreement. Plaintiffs performed all of their obligations under the TC&J Asset Management, LLC Operating Agreement.

81. Defendants breached their obligations under the TC&J Asset Management, LLC Operating Agreement.

82. In entering into the TC&J Asset Management, LLC Operating Agreement, Plaintiffs relied upon Defendants to deal fairly and to take no action that would prevent or hinder Plaintiffs from obtaining the benefit of their bargain with Defendants.

83. In addition to the terms of the TC&J Asset Management, LLC Operating Agreement, Defendants impliedly covenanted that each would deal with Plaintiffs fairly and in good faith and would not arbitrarily, capriciously, or without good cause deprive Plaintiffs of the benefit of their bargain, or wrongfully deprive Plaintiffs of the right to full and fair consideration.

84. By the acts alleged above, Defendants breached the implied covenants of good faith and fair dealing, and each of its other covenants set forth above.

85. As a result of the foregoing conduct, Defendants have suffered damages in an amount to be proven at trial, in excess of $180,000.

86. Defendants' conduct, as alleged above, was willful, malicious, and intentional, and done for the purpose of depriving Defendants of property or legal rights or otherwise causing injury, and, therefore, was despicable conduct that subjected Plaintiffs to a cruel and unjust hardship in conscious disregard of Plaintiffs' rights, so as to justify an award of exemplary and punitive damages in an amount to be established at trial.

## COUNT III: UNJUST ENRICHMENT– AXENT- MIDWEST CAPITAL FUND, LLC

87. Plaintiffs repeat and reallege the allegations contained in each of the foregoing Paragraphs as if fully set forth herein. Pursuant to the Axent-Midwest Capital Fund, LLC Operating Agreement, Plaintiffs were due and owing 45% membership interest in Axent-Midwest, which included 45% of the company's profits and other good and valuable consideration.

88. Pursuant to the January 1, 2020 Consent in Lieu of Special Meeting of Members and

April 9, 2020 Amended Operating Agreement, Miller and Levine stripped MBFMCA of its due and rightful membership interest without consideration, wrongfully taking and redistributing 30% of MBFMCA's membership interest and increasing Axentia's membership interest to 65% and 72nd Street's membership interest to 20%.

89. Defendants were unjustly enriched when they retained for themselves the membership interest, or a portion of the membership interest, belonging and due and owing to Plaintiffs.

90. Defendants were unjustly enriched when they retained for themselves the distributions due and owing to Plaintiffs pursuant to the Axent-Midwest Capital Fund, LLC Operating Agreement, and the Axent-Midwest Capital Fund, LLC Amended Operating Agreement, including but not limited to the distributions due and owing to Plaintiffs as a result of the Axent-Midwest portfolio.

91. Defendants were unjustly enriched when they retained for themselves the distributions due and owing to Plaintiffs as a result of the Indy Acquisition Syndication.

92. Defendants were unjustly enriched when they used funds due and owing to Plaintiffs as membership interest or distribution to pay to Miller, directly or indirectly, and James Miller, directly or indirectly, debt that was purportedly owed at one time by AxentAdvance Capital, LLC.

93. To prevent Defendants from being unjustly enriched, Plaintiffs are entitled to recover an amount to be proven at trial, in excess of $4 million due and owing under the Operating Agreements, including but not limited to the *pro rata* distributions due and owing to Plaintiffs as a result of the Axent-Midwest portfolios, and the amount paid or otherwise distributed to Miller and James Miller purportedly as a result of a debt owed by AxentAdvance Capital, LLC, and funds due and owing under the Indy Acquisition Syndication.

**COUNT IV: UNJUST ENRICHMENT–
TC&J ASSET MANAGEMENT**

94. Plaintiffs repeat and reallege the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

95. Pursuant to the October 30, 2019 Operating Agreement, Plaintiffs were due and owing 45% membership interest in TC&J, which included 45% of the company's revenue and other good and valuable consideration.

96. By an Amended Operating Agreement, by Consent in Lieu of Special Meeting of Members, on or about dated January 1, 2020, and the April 9, 2020 Amended Operating Agreement, Axentia, acting through Miller, and 72nd Street Partners, acting through Levine, stripped MBFMCA of its membership interest, wrongfully taking and redistributing MBFMCA's membership interest and increasing Axentia's interest to 80% and 72nd Street's interest to 20%.

97. Defendants were unjustly enriched when they retained for themselves the membership interest belonging to MBFMCA without payment or due consideration.

98. Defendants were unjustly enriched when they retained for themselves the monies owed to MBFMCA pursuant to the TC&J Asset Management Operating Agreement.

99. Defendants were unjustly enriched when they used funds due and owing as membership interest or distribution pursuant to the TC&J Asset Management Operating Agreement to pay to Miller, directly or indirectly, and James Miller, directly or indirectly, debt that was purportedly owed at one time by AxentAdvance Capital, LLC.

100. To prevent Defendants from being unjustly enriched, MBFMCA is entitled to recover an amount to be proven at trial, in excess of $180,000 due under the TC&J Asset Management Operating Agreement.

### COUNT V: FRAUD IN THE INDUCEMENT

101. Plaintiffs repeat and re-allege each of the above averments.

102. Defendants made material misrepresentations regarding their purported business

16

plan for Axent-Midwest, representing that Defendants were arranging for the purchase of performing portfolios from Axentia when, in fact, the portfolios in large part were not performing and were materially compromised.

103. Defendants made material misrepresentations regarding their purported business plan for Axent-Midwest, representing that Defendants intended to engage immediately in the direct purchase or purchase participations of MCAs, when, in fact, the transaction was primarily, if not exclusively, intended to attract money from new investors to pay debts purportedly owed to Miller, James Miller and others and to divert Axent-Midwest's revenue to Defendants and to the exclusion of Plaintiffs.

104. Defendants had no intention to use investor funds to, and in fact did not, purchase or fund new portfolios.

105. Defendants made material misrepresentations regarding their purported business plan for Axent-Midwest, failing to disclose and purposely disguising the material fact that Axent-Midwest's business would be limited to the assumption of AxentAdvance's existing business unless and until Axent-Midwest raised sufficient money first to satisfy purported debts owed to Miller and his brother.

106. Defendants made material misrepresentations regarding the compensation that would be paid to Miller. Specifically, Defendants represented that the managers (including Miller) would not receive any compensation or payment for their efforts in connection with the sale of promissory notes other than the distributions to members set forth in the Axent-Midwest Capital Fund, LLC Operating Agreement when, in fact, Miller and Levine failed to disclose and purposely disguised that Miller always intended to receive $1.5 million to satisfy AxentAdvance's purported debt obligations to Miller as well as $3 million for his brother James Miller.

107. Defendants made material misrepresentations regarding the Company's investment

strategy, representing that the strategy would be dependent upon the performance of the merchants to whom it would advance funds, omitting to disclose and purposely disguising that AxentAdvance's MCA portfolio consisted largely of assets that were in default or were otherwise uncollectable, thereby depleting any funds that could have been used to advance funds to clients and customers.

108. Defendants' material misrepresentations were made to induce Plaintiffs to invest in Axent-Midwest and to refer business to Axent-Midwest.

109. Defendants knew that their material misrepresentations were false when made or made them with reckless disregard for their truth or falsity.

110. Plaintiffs reasonably relied on Defendants' material misrepresentations to their detriment, causing substantial pecuniary loss, including economic and non-economic damages and additional damages.

## COUNT VI: BREACH OF FIDUCIARY DUTY

111. Plaintiffs repeat and re-allege each of the above averments.

112. Defendants had a fiduciary duty to Plaintiffs arising out of the relationship of the parties.

113. Defendants breached their fiduciary duties to Plaintiffs.

114. As a direct and proximate result of Defendants' breaches of fiduciary duty Plaintiffs have been damaged.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter a judgment in their favor and against Defendants:

    a. in an amount which will fully and fairly compensate them for their losses, all damages available under the law, costs of this action, and all other relief just and

proper;

b. for punitive damages;

c. for pre-judgment interest at the maximum rate permitted by law;

d. for recovery of attorneys' fees as provided by law, contract, or statute;

e. for costs; and

f. for any other and further relief as the court may deem proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all triable issues in the present matter.

Dated: New York, New York
December 2, 2023

Respectfully submitted,

By: *Liberty L Roberts*

Liberty L. Roberts, Atty. No. 23107-49
CHURCH CHURCH HITTLE + ANTRIM
Two North Ninth Street
Noblesville, IN 46060
lroberts@cchalaw.com
O: (317) 773-2190

By: *Peter R. Ginsberg*

Peter R. Ginsberg
Moskowitz Colson Ginsberg & Schulman
80 Broad Street, 19th Floor
New York, NY 10004
pginsberg@mcgsllp.com
O: (212) 257-6455
(Pro hac vice admission pending)

*Attorneys for Plaintiffs*